Nathan H. DUNCAN, Appellant
(Plaintiff Below),

v.

GEORGE MOSER LEATHER COMPA-
NY, Appellee (Defendant Below).

No. 2–479A112.

Court of Appeals of Indiana,
Second District.

Aug. 28, 1980.

Rehearing Denied Nov. 3, 1980.

David V. Scott, Rebecca G. Looney, Kelso & Scott, New Albany, for appellant.

Michael A. Bergin, Locke, Reynolds, Boyd & Weisell, Indianapolis, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Plaintiff-appellant Duncan appeals the decision of the Industrial Board denying him recovery of his form 14 Workmen's Compensation application for review on account of a change in condition.

We affirm in part and reverse in part.

## FACTS

Following a fall and strain to his back on May 29, 1974, while working at Moser Leather Company (Company), Duncan filed a form 9 application for compensation under the Workmen's Compensation Act.[1] An award was entered by the Industrial Board.

On June 24, 1976, Duncan filed a form 14 application claiming a change in condition. From the decision of the single hearing judge Duncan sought review to the Full Board. On March 22, 1979, the following findings and award were entered:

Said Full Industrial Board having heard arguments of counsel and having reviewed the entire file and being duly advised in the premises, now finds that on October 10, 1974, plaintiff filed his Form 9 application pursuant to which an agreed and stipulated award was entered on July 18, 1975, which found that the plaintiff suffered a 16.8% permanent partial impairment to the man as a whole as a result of an accidental injury he received on May 29, 1974.

It is further found that on June 24, 1976, the plaintiff filed his Form 14 alleging that his condition had changed since the award; that he now suffers from a permanent and total disability as a result of said accident.

It is further found from the only medical evidence submitted, that of Dr. Millan, that the plaintiff suffers from a lower back strain which results in a 15% permanent partial impairment to the man as a whole.

It is further found that the plaintiff has been placed on a weight restriction by the said Dr. Millan and that he is not allowed to left [sic] anything heavier than fifty pounds.

It is further found that of the plaintiff's original Form 9 and from the medical reports submitted by the parties, which reports consist of Doctors McDaniel Ewing, George McCorcklin and Vernon Bundy, pursuant to which an original award of 16.8% of the man as a whole was given, that the plaintiff suffered from an injury to his upper back and not that of the lower back.

It is further found that there is no medical evidence to establish the causal connection between the plaintiff's original injury and that of which he presently complains.

It is further found that the objections to the opinion testimony by the employment counselor should be sustained on the grounds that his opinions were formed and based on documents which he, himself, did not prepare and which were not introduced into evidence at any point during the trial.

Said Full Industrial Board of Indiana now finds for the defendant and against plaintiff on plaintiff's Form 14 application filed June 24, 1976.

## AWARD

IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED by the Full Industrial Board of Indiana that the claimant has not suffered from an increased permanent partial impairment since the date of the original award.

IT IS FURTHER ORDERED that he is not permanently totally disabled nor are the injuries for which he presently com-

1. Ind.Code 22–3–3–1 et seq.

plains causally connected to that of his original injury.

IT IS FURTHER ORDERED that the Workmen's Compensation Act and the laws construing the same do not permit a claimant to obtain permanent total disability benefits pursuant to a Form 14 application once the claimant has received an original award for permanent partial impairment.

IT IS FURTHER ORDERED that the plaintiff take nothing by his Form 14 application filed June 24, 1976.

DATED THIS 22 day of March, 1979.

From this award Duncan perfected his appeal to this court.

### ISSUES

I. May a claimant obtain permanent total disability benefits pursuant to a form 14 application once he has received an award for permanent partial impairment?

II. Did the evidence show as a matter of law that Duncan's injuries were causally related to his injury under the original award?

III. Did the Board err in excluding opinion testimony on the grounds that the expert's opinions were based on documents that he did not prepare and were not in evidence?

### I.

■ *ISSUE*—May a claimant obtain permanent total disability benefits pursuant to a form 14 application once he has received an award for permanent partial impairment?

*PARTIES' CONTENTIONS*—Duncan contends that Ind.Code 22–3–3–27 permits the Board to modify or change the permanent partial impairment award to a permanent total disability award upon a showing of the appropriate change in his condition.

The Company argues that Duncan may only obtain modification of his permanent partial impairment award upon a showing of an increase or decrease in the percentage of impairment.

*CONCLUSION*—Given a showing of a change in condition, Ind.Code 22–3–3–27

authorizes a recovery for permanent total disability following an award for permanent partial impairment.

Several Indiana cases, *infra*, have recognized but not decided the question of whether an impairment award precludes a later determination of permanent total disability. We shall fearlessly attempt to cut the Gordian knot; a knot which is raised by virtue of the Board's conclusion that:

IT IS FURTHER ORDERED that the Workmen's Compensation Act and the laws construing the same do not permit a claimant to obtain permanent total· disability benefits pursuant to a Form 14 application once the claimant has received an original award for permanent partial impairment.

Duncan requested in his original application, filed on October 10, 1974, compensation "for injuries from which he had not yet fully recovered and did not know when he would be fully recovered."

The Board found that he had sustained a strained back from an accident arising out of and in the course of his employment, that his condition had reached a permanent and quiescent state resulting in a 16.8% permanent partial impairment of the man as a whole, that Duncan had received some total temporary disability and compensation for surgery from the company, and that he had sustained an additional 16 weeks of temporary total disability for which he had not been compensated. He was awarded compensation for the past total temporary disability and current permanent partial impairment. No appeal was taken from the award and there were no issues left undecided or pending following the award. *See Palmeri v. Riggs-Sargent, Inc.* (1970), 147 Ind.App. 430, 261 N.E.2d 887; *Smith v. Brown* (1924), 81 Ind.App. 667, 144 N.E. 849.

On his subsequent form 14 application he stated on line two: "[t]hat the disability of said employee on account of said injury has increased since the date of said award," and line seven: "[t]hat said permanent partial impairment has increased since the date of said award."

The Board determined that the Act did not allow the original award for permanent partial impairment to be amended to permanent recovery for total disability compensation.

The Workmen's Compensation Act, Ind. Code 22–3–3–10, establishing compensation to be awarded for work-related injuries to employees says in pertinent part:

(b) . . . With respect to injuries in the following schedule occurring on and after July 1, 1971, and before July 1, 1977, the employee shall receive in addition to temporary total disability benefits not exceeding twenty-six [26] weeks on account of said injuries, a weekly compensation of sixty percent [60%] of his average weekly wages, not to exceed one hundred dollars [$100] average weekly wages, for the period stated for such injuries respectively.

\* \* \* \* \* \*

(3) For injuries resulting in total permanent disability, five hundred [500] weeks.

\* \* \* \* \* \*

(6) In all other cases of permanent partial impairment, compensation proportionate to the degree of such permanent partial impairment, in the discretion of the Industrial Board, not exceeding five hundred [500] weeks.

(7) In all cases of permanent disfigurement, which may impair the future usefulness or opportunities of the employee, compensation, in the discretion of the Industrial Board, not exceeding two hundred [200] weeks, except that no compensation shall be payable under this paragraph where compensation is payable elsewhere in [this section]. (hereinafter referred to as Section 10(b)).

The specific language of the statute certainly does not prohibit an award for total permanent disability under subsection (b)(3) subsequent to an award under (b)(6), which is true, for example, under subsection (b)(7) which expressly prohibits compensation to be paid under subsection (b)(7) and elsewhere in the section.[2]

Nor does the case law prohibit any such award. *See Allen v. United Telephone Company, Inc.* (1976), 168 Ind.App. 696, 345 N.E.2d 261 (in footnote three this court stated: "[W]e do not address the question whether an impairment award precludes a later determination of permanent total disability," citing *Bagwell v. Chrysler Corp.* (1976), 168 Ind.App. 110, 341 N.E.2d 799, and *Johnson v. Thomas & Skinner, Inc.* (1972), 153 Ind.App. 467, 287 N.E.2d 894.)

Section 31 of two earlier versions of the present Act[3] dealt with injuries which resulted in permanent partial disability,[4] such

2. *Custer v. Fougerousse* (1953), 123 Ind.App. 559, 112 N.E.2d 584; *Calumet Paving Co. v. Butkus* (1943), 113 Ind.App. 232, 47 N.E.2d 829; *Central Indiana Coal Co. v. Meek* (1931), 93 Ind.App. 9, 177 N.E. 332; *Indiana Limestone Co. v. Stockton* (1928), 88 Ind.App. 22, 163 N.E. 27.

3. Laws 1915, ch. 106, § 31 reads in part:
"for injuries in the following schedule the employee shall receive in lieu of all other compensation a weekly compensation equal to fifty-five per cent. of his average weekly wages for the periods stated against such injuries respectively, to-wit: (a) For the loss by separation of not more than one phalange of a thumb \* \* \* 15 weeks. \* \* \* (h) For the loss by separation of one arm at or above the elbow joint \* \* \* 200 weeks. \* \* \* In all other cases of permanent partial disability \* \* \* compensation in lieu of all other compensation shall be paid when and in the amount determined by the indus-

trial board, not to exceed fifty-five per cent. of average weekly wages per week for a period of [200] weeks." *In re Denton* (1917), 65 Ind.App. 426, 429, 117 N.E. 520, 521. Acts 1929, ch. 172, § 31 reads in part as follows:
"For injuries in the following schedule the employee shall receive in lieu of all other compensation, on account of said injuries, a weekly compensation of 55 percent of his average weekly wage for the periods stated for said injuries respectively to wit: . . .." *Roush v. W. R. Duncan & Son* (1932), 96 Ind.App. 122, 131, 183 N.E. 410, 413.

4. It appears that in this early Act the term "disability" in Section 31 is used in the same context as "impairment" is used in Ind.Code 22–3–3–10(b)(6), in fact, the court at one point in *Denton* did substitute the word "impairment" in its discussion of the general provision of Section 31.

as a loss of a finger or an arm or a physical sense. A fixed period of compensation was awarded for such permanent injury "in lieu of all other compensation," therefore an award for temporary total disability could not be recovered for the same injury that qualified under Section 31. *In re Denton* (1917), 65 Ind.App. 426, 117 N.E. 520; *Roush v. W. R. Duncan & Son* (1932), 96 Ind.App. 122, 183 N.E. 410. Employees suffering Section 31 permanent partial disabilities were provided a fixed period of compensation which was "exclusive of all other compensation for the specific injury that results in permanent partial disability, even though such injury results immediately in temporary, *but not permanent, total disability*." (Emphasis added.) *In re Denton*, 65 Ind.App. at 430, 117 N.E. at 521. No case decided whether an injured employee *could* receive, for the same injury, an award for *total permanent disability* upon a change in condition subsequent to a Section 31 award. These earlier Acts did not prohibit a change in compensation from the permanent partial impairment loss to the permanent total disability, neither did they allow it.

The injured employee in a recent case, *Bagwell v. Chrysler Corporation* (1976), 168 Ind.App. 110, 341 N.E.2d 799, did request the Industrial Board for a change of a permanent partial impairment award to one for permanent total disability. The employer made the expected response that the awards are mutually exclusive and that the only possible award was for an increase or decrease in the impairment rating. But because the statute of limitations barred Bagwell's recovery this issue was not decided. This court did, however, comment on the distinction between disability and impairment:

Indiana has long recognized that *disability and impairment are separate and distinct concepts.* [citations omitted]. *Such distinction does not necessarily preclude duplication in benefits.* In fact, the legislative policy contemplates such a duplication to the extent of the first 26 weeks of temporary total disability by not allowing the employer credit for that period when a subsequent impairment award is made. This policy duplication does not violate the prohibition found in the impairment statute (Sec. 31), which permits only a fixed percentage of wages to be paid for a fixed number of weeks as compensation for the impairment.

168 Ind.App. at 115, 341 N.E.2d at 802–03. (Emphasis added.)

Ind.Code 22–3–3–27 does not permit a duplication of awards, but it does permit a modification of benefits if the evidence justifies the change following the filing of a form 14 application.[5]

In *White v. Woolery Stone Company* (1979), Ind.App., 396 N.E.2d 137, 139, this court discussed "permanent total disability" with a finer focus:

Temporary total disability payments are intended to compensate an employee for the treatment period following a work-related injury, and during this treatment period it is relevant whether the injured workman has the ability to return to work of the same kind or character. *Covarubias v. Decatur Casting; Division of Hamilton Allied Corp.,* (1976) Ind.App., 358 N.E.2d 174. If he does not have the ability to return to work of the same kind or character during the treatment period, he is temporarily totally disabled. *Covarubias, supra.* This is to be compared with permanent total disability and per-

---

**5.** This approach is supported in *Perez v. United States Steel Corp.* (1977), Ind.App., 359 N.E.2d 925:

Despite the definitional difference we have drawn between that inability which constitutes temporary total disability and the inability which constitutes permanent total disability, the basic distinction between disability (the inability to work) and impairment (loss of physical function) remains. *The terms do not describe results that necessarily*

*are mutually exclusive.* The court recognized this in *Burton v. Rock Road Const. Co.* (1968), 142 Ind.App. 458, 235 N.E.2d 210, where an employee claimed permanent total disability and the industrial board found that he had suffered no permanent partial impairment. On appeal this court held that the impairment finding was insufficient for purposes of judicial review to constitute a finding on the claim of permanent total disability. (emphasis supplied)

manent partial impairment which are determined, alternatively, when the work-related injury reaches a permanent and quiescent state, the treatment period ends, and the permanent injury can be assessed for compensation purposes. *Covarubias, supra; Perez, supra.*

Dean Small, in Small, *Workmen's Compensation Law of Indiana,* § 9.4, p. 244 states:

"A total disability to be permanent must be one which so destroys or shatters a workman's wage earning capacities as to leave him unable to resume reasonable types of employment for the remainder of his life. Since this form of disability is treated in the same section with other harms comprising threats to wage-earning power such as impairments and lost uses, total permanent disability must be taken to require a greater incapacity than that produced by any other of the scheduled harms. However, it is not necessary to a showing of total permanent disability that the workman prove an utter inability to do anything with the remains of his body. The believe-it-or-nots demonstrate that even the most hopeless human wrecks have on occasion developed obscure means for obtaining livelihood. It is sufficient if the workman can show that he has been so incapacitated by his injuries that he cannot carry on reasonable types of employments. The reasonableness of the workman's opportunities will be measured by his physical and mental fitness for them and by their availability."

*If the work-related accident does not result in permanent total disability, an award for permanent partial impairment then compensates for the loss to the permanently impaired party.* (Emphasis added.)

*See also Dennison v. Martin, Inc.* (1979), Ind.App., 395 N.E.2d 826.

So once an injury reaches a permanent and quiescent state, an assessment (pursuant to an original form 9 application or agreement) may be made as to the extent of the permanent injury. *Dennison, supra.* The injured employee may then be compen-sated for his specific permanent injury according to the benefits enumerated in Ind. Code 22–3–3–10. *Perez v. United States Steel Corp., supra.*

If neither party appeals this award, it becomes a full and final determination of the condition of the injured worker at that time and of the employer's liability to pay, subject only to a petition for modification. *Lukich v. West Clinton Coal Co.* (1937), 104 Ind.App. 73, 10 N.E.2d 302; *Smith v. Brown, supra.*

The award is not, however, an adjudication as to the claimant's future condition, and in a situation in which a resultant condition subsequently appears, the employee may seek modification of the original award under Ind.Code 22–3–3–27, which provides in part:

The power and jurisdiction of the industrial board over each case shall be continuing and from time to time, it may, upon its own motion or upon the application of either party, on account of a change in conditions, make such modification or change in the award, ending, lessening, continuing or extending the payments previously awarded, either by agreement or upon hearing, as it may deem just, subject to the maximum and minimum provided for in this act [22–3–2–1—22–3–6–3].

\* \* \* \* \* \*

The board shall not make any such modification upon its own motion, nor shall any application therefor be filed by either party after the expiration of two [2] years from the last day for which compensation was paid under the original award made either by agreement or upon hearing, except that applications for increased permanent partial impairment are barred unless filed within one [1] year from the last day for which compensation was paid. The board may at any time correct any clerical error in any finding or award. (Section 27 herein.)

*Tom's Chevrolet Sales v. Curtis* (1958), Ind.App., 147 N.E.2d 571; *Pedlow &* 120 N.E. 603; Small, *supra.*

The language of Section 27 does not expressly or impliedly preclude an injured employee from seeking a change from one award to another among the various subsections of Section 10 (except as to subsection 7). In fact the general language of Section 27 permits a change in the award, provided a change in conditions is proven. *See Johnson v. Thomas & Skinner, Inc.* (1972), 153 Ind.App. 467, 287 N.E.2d 894. *Tom's Chevrolet Sales, supra; Denasoff v. Foundation Co.* (1927), 86 Ind.App. 272, 155 N.E. 521.

If the Workmen's Compensation Act is for the benefit of the employee and "the Act [should] be liberally construed so as not to negate the Act's humane purposes," *Frampton v. Central Indiana Gas Co.* (1973), 260 Ind. 249, 251, 297 N.E.2d 425, 427, then we are led to conclude that an impairment award should not preclude a later determination of permanent total disability. 101 C.J.S. *Workmen's Compensation* § 850 (1958) (statutes conferring a power to change an award in accordance with a change in condition are to be liberally construed.) Thus a change in condition may be compensated when it is manifested by a condition recognized in the same or another subsection provided the total combined award does not exceed the limits set under the Act.[7] *Accord Arizona Sand & Rock v. Industrial Commission of Arizona* (1979),

123 Ariz. 448, 600 P.2d 752; *Kubiak v. Briggs Manufacturing Co.* (1938), 286 Mich. 329, 282 N.W. 427; *Bartlett-Collins Glass Co. v. Washabaugh* (1933), 166 Okl. 90, 26 P.2d 420; *Texas Employers' Insurance Association v. Eskue* (1978), Tex.Civ.App., 574 S.W.2d 814; 101 C.J.S. *Workmen's Compensation* § 854 (1958). Conditions other than an increase or decrease in the percentage of physical impairment might change or subsequently develop as would justify a claim under subsection (3) of Section 10(b). *See Allen, supra;* Small, *supra; McMillan v. American Hoist & Derrick Co.* (1975), 167 Ind.App. 328, 338 N.E.2d 677.

Duncan was thus required to prove that he was permanently totally disabled and that this constituted a change in condition since the previous award.

■ Using Professor Small's definition and description of permanent total disability, quoted supra, Duncan was required to show that he is unable to carry on reasonable types of employment.[8] *Perez, supra; Covarubias, supra.* Duncan did present some evidence of his inability to work and some evidence that there was a change in condition since the prior award. However, the Board also had evidence before it from which it could determine that there was no causal connection between his original inju-

---

**7.** The parties question whether *Smith v. Brown, supra,* supports the contrary view. There the court stated that a change in condition, reflected only in an inability to work, will not support a modification of a permanent partial impairment award, that such award was made for loss of a member and not the disability therefrom. The court quoted a portion of *Denton, supra,* explaining that Section 31 provided a remedy in lieu of all other compensation. However, within that quote we also find:

"It is possible for a case to arise where the loss of an arm, in the absence of other injuries, may by reason of complications, totally disable a workman for more than 200 weeks. His compensation, however, under section 31, *his total disability not being permanent,* would be limited to 200 weeks." (emphasis added.)

81 Ind.App. at 672, 144 N.E. at 850. This emphasized portion does not support a result denying a recovery for total permanent disability after a finding of permanent partial impairment under either the present or former statutes where a change in condition is proven.

**8.** Duncan's condition is similar to that of Perez:

Perez need only show the Industrial Board that he is unable to carry on *reasonable types of employment* —not that he is utterly incapable of functioning. . . . Reasonable employment for one experienced only in manual labor would, of necessity, be manual labor. Yet, the evidence revealed the medical opinion that Perez is one hundred per cent disabled "insofar as [employment] entails bending, stooping, lifting, physical effort." The day he was evaluated by the plant physician as being 20% permanently partially impaired, U. S. Steel took his badge, sent him home, and said, "Okay, that's it." U. S. Steel never called Perez back to work—for any job. The Full Industrial Board has a *responsibility* to make a specific finding on total permanent disability. (emphasis in original).

*Perez,* Ind.App., 359 N.E.2d at 929 (Staton, P. J., concurring opinion).

ry and his subsequent complaints (Issue two, *infra*). The Board's legal conclusion that the Act prohibits an award of total disability benefits after an award for permanent partial impairment is erroneous and contrary to law. But it was not necessary for the Board to decide the question of whether Duncan was entitled to receive an award for permanent total disability.

## II.

*ISSUE*—Did the evidence show as a matter of law that Duncan's injuries were causally related to his injury under the original award?

■ Although the Board did not believe the Act permitted Duncan's claim, it proceeded to make certain findings and conclusions, including:

It is further found from the only medical evidence submitted, that of Dr. Millan, that the plaintiff suffers from a lower back strain which results in a 15% permanent partial impairment to the man as a whole.

.  .  .  .  .

It is further found that of [sic] the plaintiff's original *Form 9* and from the medical reports submitted by the parties, which reports consist of Doctors McDaniel *Ewing*, George *McCorcklin* [sic] and Vernon *Bundy*, pursuant to which an original award of 16.8% of the man as a whole was given, that the plaintiff suffered from as [sic] injury to his upper back and *not that of the lower back.*

It is further found that there is *no medical evidence to establish the causal connection* between the plaintiff's original injury and that of which he presently complain [sic]. (Emphasis added.)

*PARTIES' CONTENTIONS*—Duncan contends the Board's finding that there was no causal connection between his injuries because the original injury was to his upper back only and at the second hearing his only complaints were of the lower back, is contrary to law.

The Company contends the Board correctly found that the original award was made for a strain to the back in a different

area and condition than that of which Duncan later complained.

*CONCLUSION*—The Board's finding that Duncan's injuries were not related to the original injury is supported by evidence in the record.

■ Because the Company did not present any evidence and Duncan appeals a negative decision, the standard of review described in *Dennison v. Martin, Inc.* (1979), Ind.App., 395 N.E.2d 826, 827, is applicable:

A claimant bears the burden of proof for his claim. *Evans v. Indiana University Medical Center*, (1951) 121 Ind.App. 679, 100 N.E.2d 828. A negative award may be sustained by an absence of evidence favorable to the claimant's contentions or by the presence of evidence adverse to the claimant's contentions. *Martin v. Monsanto Co.*, (1975) 166 Ind.App. 5, 333 N.E.2d 828.

In *Hilltop Concrete Corp. v. Roach*, (1977) Ind.App., 366 N.E.2d 218, 224, Judge Buchanan (now Chief Judge) wrote:

"It is the Board which has the duty to find the nature and extent of a claimant's injury and to grant the appropriate compensation under the Act. .  .  . In doing so the Board must weigh all the relevant evidence, including any expert testimony and claimant's own statement regarding the extent and character of his injury. .  ." (Citations omitted)

In *Hendrickson v. Contracting & Material Co.*, (1966) 138 Ind.App. 193, 195, 212 N.E.2d 903, 904, the claimant presented evidence at the hearing before the Board, but his employer presented no evidence. Judge Carson, in reviewing the negative award, emphasized that

"[t]he Industrial Board as the trier of the facts had the right to believe that evidence which it finds creditable and by the same token the right to disbelieve such evidence as it does not find worthy. .  .  ."

Finally, the opinion in *Davis v. Webster*, (1964) 136 Ind.App. 286, 292, 198 N.E.2d 883, 886, includes this well established rule:

"Before there can be a reversal of a negative award on the evidence, it is necessary that all the evidence appear one way and be so conclusive in nature and character as to force a conclusion in the minds of reasonable men, contrary to that reached by the Industrial Board. . . " (Citations omitted)

See also, Gentry v. Jordan (1975), 166 Ind. App. 695, 337 N.E.2d 530.

The evidence on which the original award was based was before the Industrial Board at the hearing on his petition for a change of condition. Lukich v. West Clinton Coal Co. (1937), 104 Ind.App. 73, 78, 10 N.E.2d 302, 305:

All of the evidence introduced before the board or any member thereof at the first hearing in such proceeding was before it on said last hearing without any further introduction by either party. It was the duty of the board to take cognizance of the evidence and its record on the original hearing and consider them with all of the proper evidence introduced on appellant's last application in determining whether appellant was entitled to compensation.

The evidence before the Board at its first hearing was stipulated: while at work on February 21, 1972, Duncan felt a sharp pain "in the back" and fell to the floor. He saw the company doctor, then returned to work without further problems. On August 1, 1973, he again fell after having felt a sharp pain "in the lower back." After seeing the company doctor he returned to work, encountering some trouble "with his back" periodically thereafter. On May 29, 1974, he was again pushing a six wheeled truck loaded with wet hides when he experienced a sharp pain "in the back." The following day he suffered pain from a right inguinal hernia. (Deposition of Dr. McCrocklin.)

Dr. Bundy saw Duncan that day and diagnosed a muscle strain in the lower right shoulder. Following an appointment one week later no complaint was ever again made of pain in this area.

The hernia was repaired in June, 1974. During follow-up care for the hernia surgery Duncan complained of pain in the upper right lumbar muscles similar to that he had experienced intermittently since 1972. After unsuccessfully attempting to return to work during the week of August 19, 1974, Duncan went to Dr. McCrocklin concerning his back problem. (Medical report of Dr. Bundy.)

Dr. McCrocklin found "tenderness in the mid line in the lower thoracic and upper half of the lumbar region . . . [in] the lower ribs on the right side posteriorly and the right flank muscles. In the midline the lower sacral area is also tender." The muscular and ligamentous strain in the "mid portion of the back" continued through September, October, November and December. After Duncan fell, on December 29, 1974, Dr. McCrocklin found "some increased tenderness in the low back and mid back." (Deposition of Dr. McCrocklin.)

On February 4, 1975, Dr. Ewing examined Duncan for a complaint of "pain near the center of [his] back." Dr. Ewing noted that a "moderately severe lumbar muscle spasm is present. Increase in the dorsal cavitas and to a less extent to lordosis of lower back." (Medical report of Dr. Ewing.)

Thereafter some pain continued until March 5, when Dr. McCrocklin examined Duncan in the hospital emergency room after he had experienced a sudden increase in pain while walking. The doctor diagnosed a "possible herniated lumbar disk." On April 11, 1975, Duncan "had a repeat episode of severe back pain" located in the back and down into the right lower extremities with tenderness in the right lower rib area. Dr. McCrocklin last saw Duncan on April 30, 1975. He described Duncan's complaints: "the patient medically probably has a strain of the mid back, right flank, and some involvement of the lower back. This is a chronic strain which at times becomes acute." He associated the strain with the May 29, 1974 accident. (Deposition of Dr. McCrocklin.)

Duncan filed his form 9 application, stating: "his injuries were right direct inguinal hernia, low back strain."

The medical reports, stipulations of the parties, and the original award were all filed in July, 1975.

The Board, in the first decision, did not identify in its findings which particular part of the back was injured, the nature of the injury, or the particular symptoms which were compensated.

■ Because an award by the full Board is conclusive and binding as to all questions of fact, this court is reluctant to disturb such administrative findings. Ind.Code 22–3–4–8.

> On appeal, this Court cannot weigh the evidence heard by the Board to determine for whom it preponderates, and only if reasonable men would be bound to reach the opposite conclusion from the evidence in the record, may the decision of the Board be reversed.

*Bohn Aluminum & Brass Co. v. Kinney* (1974), 161 Ind.App. 128, 134, 314 N.E.2d 780, 784.

From the above medical evidence it would be reasonable for the Board to find that the original injury was principally to the muscles and ligaments in the upper one-half of the lumbar and lower thoracic areas, identified on Exhibit A (Dr. McCrocklin's deposition) as area # 1. This evidence supports the Board's finding that the original injury was to the upper back (although it could have been more accurately described as the midback) and not to the lower back.

Not until over ten months later, in March, 1975, was a possible problem discovered in the fourth and fifth lumbar disc space. The evidence does not compel a finding that the bulging disc was precipitated by the accident at work. This subsequent disc abnormality was located below, and was not a part of, the areas of injury labeled # 1 and # 3 on Exhibit A (and above area # 2).

Reasonable minds could find that the May 29th accident only caused the muscle and ligament strain as was diagnosed soon after the accident, and that the disc problem was a separate and unconnected medical condition with its own new symptoms which occurred only later. Even though the disc abnormality was first suspected prior to the rendering of the first award, the evidence does not compel the finding that it was connected with, or that it arose out of the original accident, or was included in the first award. Further, although there were references to pain in the "lower back" ( # 2 on Exhibit A) this was also a muscular strain, distinct from the disc problem.

The Board could properly find that the injury at the time of the change of condition application was to the L4–5 disc space located in the lower back, and that it was unconnected to the muscular injury to the area principally located above this disc area.

All harm directly caused by an accident must be included in the original application for compensation. Section 45 may only be used when there is a new, additional or previously undiscovered condition found subsequent to the original award, and proven to be causally connected to the original accident. Small, at 249; 101 C.J.S., at § 854.i.; 3 A. Larson, Workmen's Compensation Law, § 81.31, at 15–498.

The evidence is not without conflicting inferences, and it does not support only one reasonable inference or conclusion which is contrary to the Board's conclusion.

### III.

*ISSUE*—Did the Board err in excluding opinion testimony on the grounds that the expert's opinions were based on documents that he did not prepare and were not in evidence?

■ *PARTIES' CONTENTIONS*—Duncan argues that Richard Albright's testimony was admissible and should have been considered by the full Board under the exception to the hearsay rule which allows an expert to testify from reliable reports or information not itself entered into evidence.

The Company argues that Duncan's witness and the testimony he offered did not meet the qualifications of the exception and therefore were properly excluded.

*CONCLUSION*—The Board could properly consider the portion of Albright's testimony relating to facts already in evidence.

Richard Albright, a rehabilitation counselor employed by the Indiana State Rehabilitation Services, was presented as an expert witness for the purpose of establishing evidence of Duncan's lack of employability. For almost eight years he had been employed to assist handicapped and disabled persons in securing gainful employment. He had received no formal training in rehabilitation counseling or as a psychologist.

Albright's procedure to determine whether Duncan was disabled, and therefore qualified for his service, included an initial intake interview with him on May 17, 1976, possibly a medical exam, a psychological test since the necessity for training appeared to be involved, and requests were sent to Doctors Tomlin and Mellon for their reports based on their previous treatment of Duncan. Based upon the test results and reports Albright made a determination certifying Duncan to be eligible for the service. To subsequent testimony concerning the lack of vocational opportunities available to Duncan, the Company objected on the grounds that the opinion rested on reports and test results not in evidence.

The single hearing member overruled the Company's objections and the testimony was incorporated into the Record. However, the Board, on review, sustained the hearsay objections and excluded all of Albright's opinion testimony from its deliberations.

The evidentiary rule was described in *Rosenbalm v. Winski* (1975), 165 Ind.App. 378, 382–83, 332 N.E.2d 249, 252–53:

It has been said that the general rule excludes a direct opinion by an expert where the opinion is based upon reports that are not in evidence or are inadmissible as substantive evidence under the hearsay rule. See: McCormick on Evidence (2d Ed., 1972), at 34.

Many of the older cases simply denounced this as usurpation of the jury function, since in such instances the expert might be said to have determined the credibility of and weighed the evidence of his informants. However, the modern view rejects this notion at least partially upon the ground that the opinion may still be attacked and the jury may choose to discredit it. See: *DeVaney [v. State* (1972), 259 Ind. 483, 288 N.E.2d 732.]

On the other hand, it is valid to observe that in such instances the jury is asked to accept as probative evidence the witness' conclusion based upon someone's hearsay assertion of a fact which the jury has no basis for finding to be true. Furthermore, if the opinion is actually dependent upon classic hearsay, the expert may lack the knowledge-qualification required for expert opinions. See: *Fischer v. State* (1974), [160] Ind.App. [641], 312 N.E.2d 904 (transfer denied).

Despite the generalization, it is well recognized that many admissible expert opinions are based, in part, upon items which are technically hearsay, such as stopping distance tables. *Ryan v. Payne* (Ky.[App.], 1969), 446 S.W.2d 273.

\* \* \* \* \* \*

Thus, it may be that the proper generalization recognizes that an expert opinion is not excludable because it is based in part on hearsay, where the hearsay is of a type normally found reliable and is customarily relied upon by the expert in the practice of his profession or area of expertise. [citations omitted.]

In addition, it would appear that an otherwise validly drawn expert opinion should not be rendered inadmissible merely because somewhere along the way the expert was exposed to an item of hearsay which he may have "considered" in that it appeared to corroborate or not dispute his conclusion. See: *e. g., Trinity Univ. Ins. Co. v. Town of Speedway* (1965), 137 Ind.App. 510, 210 N.E.2d 95. *See also Lovko v. Lovko* (1978), Ind.App., 384 N.E.2d 166; *Capital Improvement Board of Managers v. Public Service Commission* (1978), Ind.App., 375 N.E.2d 616; *Gooch v. Hiatt* (1975), 166 Ind.App. 521, 337 N.E.2d 585; *Indianapolis Union Railway v. Walker* (1974), 162 Ind.App. 166, 318 N.E.2d 578.

And in *Smith v. State* (1972), 259 Ind. 187, 190–91, 285 N.E.2d 275, 276, *cert. de-*

*nied,* 409 U.S. 1129, 93 S.Ct. 951, 35 L.Ed.2d 261 (1973):

> The types of records and reports which can be utilized should only be those produced by qualified personnel and the type which an expert customarily relies on. See *United States v. Bohle* (7th Cir. 1971), 445 F.2d 54; *Commonwealth v. Thomas* (1971), 444 Pa. 436, 282 A.2d 693. Such a limitation guarantees a relatively high degree of reliability and frees an expert to use the tools he normally relies upon in making any diagnosis.

Again in *Capital Improvement Board of Managers v. Public Service Commission* (1978), Ind.App., 375 N.E.2d 616, 626, we stated as the appropriate rule of law:

> The opinion of an expert is not necessarily rendered inadmissible or incompetent because it may be based on knowledge of facts gained from hearsay sources. Any expert worthy of the name must of necessity assimilate prior learning derived from the experiences of others. As an expert witness he draws upon various sources of information whose credibility or trustworthiness he must determine in the light of his expertness. It would completely frustrate the use of expert witnesses if they were obliged to substantiate each single factor upon which their ultimate opinion must depend upon first hand personal knowledge or personal experience. If some of the expert's factual information is derived from sources fairly trustworthy through hearsay and he has as such the ability to coordinate and evaluate that information with all the other facts in his possession secured through personal observation, the trial court may in the exercise of a sound discretion permit the expert's ultimate opinion to be considered by the jury.

(quoting from *Warren v. Waterville Urban Renewal Authority* (1967 Maine), 235 A.2d 295, 300, *cert. den.* 390 U.S. 1006, 88 S.Ct. 1249, 20 L.Ed.2d 105).

■ Thus, Indiana case law provides us with a three prong test to determine if the expert opinion is admissible when it is based in part on a report that is either not in evidence or inadmissible as substantive evidence because of the hearsay rule. In order for the opinion to be admissible (1) the expert must have sufficient expertise to evaluate the reliability and accuracy of the report, (2) the report must be of a type normally found reliable, and (3) the report must be of a type customarily relied upon by the expert in the practice of his profession or expertise. *Smith v. State, supra; Capital Improvement Board of Managers v. Public Service Commission, supra; In re Adoption of Lockmondy* (1976), 168 Ind. App. 563, 343 N.E.2d 793; *Rosenbalm v. Winski, supra.*

■ Although parts two and three of this test are met here, part one is not. The witness relying upon or using the information must have some expertise in evaluating the content. *Capital Improvement Board of Managers v. Public Service Commission, supra*; E. W. Cleary, McCormick's Law of Evidence § 15 (1972, 2d ed.). Albright admitted he had no expertise to verify the reliability or accuracy of the reports. At trial an expert in one field cannot be a conduit for the opinions of an expert in another field. *Capital Improvement Board v. Public Service Commission, supra.*

■ The primary purpose for requiring an expert to have the ability to evaluate the hearsay reports is to afford to the non-presenting party the right to meaningfully cross-examine the witness both as to his actual opinion and the reports and hearsay information upon which he bases his opinion. *Pike County Highway v. Fowler* (1979), Ind.App., 388 N.E.2d 630; *Capital Improvement Board v. Public Service Commission, supra; Trinity Universal Insurance Co. v. Town of Speedway* (1965), 137 Ind. App. 510, 210 N.E.2d 95.

■ If Albright had been allowed to give his opinion as to Duncan's employment, the company would not have had the opportunity to cross-examine him as to the accuracy and reliability of the medical reports. Albright did not have the knowledge of the

procedures used, the tests given, or the conclusions drawn by those who compiled these reports. The exclusion of hearsay is the general rule and an agency in its discretion is not bound to accept it. *C. T. S. Corp. v. Schoulton* (1978), Ind., 383 N.E.2d 293; *Carson v. Associated Truck Lines, Inc.* (1968), 143 Ind.App. 431, 241 N.E.2d 78.

Nevertheless, portions of Albright's opinion testimony concerning Duncan's ability to find employment were based on the diagnosis of Dr. Millan which was already in evidence. And part of his opinion was based upon his discussions with Duncan concerning possible employment situations in relation to his tolerance for physical activity. *Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482. Thus, the Board's finding excluding Albright's testimony was erroneous.

Because this evidence was relevant only to the extent of Duncan's inability to work, and the essential element of a causal connection between his subsequent condition and the accident was found to be lacking, any error in the exclusion of this testimony was harmless.

The decision of the Board is reversed insofar as it erroneously concludes that the Act does not permit a claimant to obtain permanent total disability benefits after receiving an original award for permanent partial impairment, and is otherwise affirmed.

SHIELDS and SULLIVAN, JJ., concur.